**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SEABURY FXONE LLC, SEABURY ASSET MANAGEMENT LLC, and SEABURY INTERNATIONAL CAPITAL HOLDINGS LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>U.S. SPECIALTY INSURANCE CO. and RSUI INDEMNITY CO.,<br><br>        Defendants. | Case No. 1:21-cv-00837-ER |

**U.S. SPECIALTY'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**CLYDE & CO US LLP**
Joseph A. Bailey III (admitted *pro hac vice*)
Justin S. Levy (admitted *pro hac vice*)
1775 Pennsylvania Avenue NW, 4th Floor
Washington, DC 20006
Telephone: 202-747-5100
Facsimile: 202-747-5150
E-mail: joseph.bailey@clydeco.us
E-mail: justin.levy@clydeco.us

Scott Schwartz
405 Lexington Avenue, 16th Floor
New York, NY 10174
Telephone: 212-710-3900
Facsimile: 212-710-3950
E-mail: scott.schwartz@clydeco.us

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND ............................................................................................................ 3

    A.    The Policy .......................................................................................................... 3

    B.    The Shareholder Dispute ................................................................................... 5

    C.    Seabury's Requests for Coverage for the Shareholder Dispute .......................... 10

III.    ARGUMENT ................................................................................................................ 10

    A.    The Insured v. Insured Exclusion And The Exception Thereto Require
           Analysis Of The Operative "Claim," Which Is The Arbitration Proceeding. ...... 11

    B.    The Claim Was Brought By Insureds Against Insureds, And Thus Falls
           Squarely Within The Plain Scope Of The Insured v. Insured Exclusion............. 15

    C.    The Claim Was Not "For" Employment Practices Wrongful Acts And Thus
           Does Not Fall Within The Exception To The Insured v. Insured Exclusion........ 16

          1.    The Exception Narrowly Applies To Claims "For" Employment
                Practices Wrongful Acts, And Does Not Apply More Broadly To
                Claims "Arising Out Of" Or "Involving" Such Acts............................... 16

          2.    The Claim Was For A Majority Shareholder "Squeeze-Out" Of The
                Minority Shareholders, And Was Not "For" Any Employment
                Practices Wrongful Act............................................................................ 18

          3.    Seabury Cannot Use The Duty To Defend "Potential For Coverage"
                Standard To Expand The Narrow Exception To The Exclusion. ............. 22

IV.    CONCLUSION.............................................................................................................. 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Century 21, Inc. v. Diamond State Ins. Co.*,
442 F.3d 79 (2d Cir. 2006)........................................................................................24

*Certain Underwriters at Lloyd's, London v. Convergys Corp.*,
No. 1:12-cv-08968-CRK, 2014 WL 3765550 (S.D.N.Y. Mar. 25, 2014) .........................17, 20

*CIM Ins. Corp. v. Midpac Auto Ctr., Inc.*,
108 F. Supp. 2d 1092 (D. Haw. 2000) ........................................................................20

*Cmty. Found. for Jewish Educ. v. Fed. Ins. Co.*,
16 F. App'x 462 (7th Cir. 2001) ...............................................................................12

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*,
603 F.3d 169 (2d Cir. 2010).....................................................................................11

*Dish Network Corp. v. ACE Am. Ins. Co.*,
21 F.4th 207 (2d Cir. 2021) .....................................................................................16

*Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*,
754 F.3d 136 (2d Cir. 2014)......................................................................................15

*Fed. Ins. Co. v. DBSI, Inc. (In re DBSI, Inc.)*,
No. 08-12687(PJW), 2012 WL 2501090 (Bankr. D. Del. June 27, 2012) .............................13

*Global Reins. Corp. of Am. v. Century Indem. Co.*,
22 F.4th 83 (2d Cir. 2021) .................................................................................16, 20

*Greenwich Ins. Co. v. Lecstar Corp.*,
No. 1:05-cv-3275-RLV, 2006 WL 2052375 (N.D. Ga. July 20, 2006)...................................12

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 (2d Cir. 2004).....................................................................................12

*Int'l Controls Corp. v. Vesco*,
556 F.2d 665 (2d Cir.1977)......................................................................................15

*Jarden, LLC v. ACE Am. Ins. Co.*,
No. CVN20C03112AMLCCLD, 2021 WL 3280495 (Del. Super. Ct. July 30,
2021), *aff'd*, No. 273-2021, 2022 WL 618962 (Del. Mar. 3, 2022) .......................................18

*Jerry's Enters., Inc. v. U.S. Specialty Ins. Co.*,
845 F.3d 883 (8th Cir. 2017) ..............................................................................12, 15

*Kephart v. Certain Underwriters at Lloyd's of London*,
    427 F. Supp. 3d 508 (S.D.N.Y. 2019) ........................................................................14

*Levy v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    889 F.2d 433 (2d Cir. 1989) ....................................................................................15

*Market Street Bancshares, Inc. v. Fed. Ins. Co.*,
    962 F.3d 947 (7th Cir. 2020) ............................................................................11, 13

*Mastrovincenzo v. City of N.Y.*,
    435 F.3d 78 (2d Cir. 2006) ......................................................................................14

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis*,
    296 F.3d 336 (5th Cir. 2002) ...................................................................................12

*Olin Corp. v. Am. Home Assurance Co.*,
    704 F.3d 89 (2d Cir. 2012) .................................................................................13, 20

*Pan Pacific Retail Props., Inc. v. Gulf Ins. Co.*,
    471 F.3d 961 (9th Cir. 2006) ...................................................................................23

*In re Pana-Oro, S.A.*,
    No. 85 CIV. 9059 (CBM), 1986 WL 2791 (S.D.N.Y. Feb. 21, 1986) ...................18

*Penn Psychiatric Ctr., Inc. v. United States Liab. Ins. Co.*,
    257 A.3d 1241 (Pa. Super Ct. 2021) ........................................................................21

*Petroterminal de Panama, S.A. v. Houston Cas. Co.*,
    114 F. Supp. 3d 152 (S.D.N.Y. 2015), *aff'd*, 659 F. App'x 46 (2d Cir. 2016) ........23

*RSUI Indem. Co. v. Desai*,
    No. 8:13-CV-2629-T-30TGW, 2014 WL 4347821 (M.D. Fla. Sept. 2, 2014) ........18

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ....................................................................................15

*Spandex House, Inc. v. Hartford Fire Ins. Co.*,
    407 F. Supp. 3d 242 (S.D.N.Y. 2019), *aff'd*, 816 F. App'x 611 (2d Cir. 2020) ..........22, 23, 24

*Stoneburner v. RSUI Indem. Co.*,
    No. 2:21-CV-00023-DBB, 2022 WL 1091337 (D. Utah Apr. 12, 2022) .........................12, 13

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*,
    73 F.3d 1178 (2d Cir. 1995), *opinion modified on denial of reh'g*, 85 F.3d 49
    (2d Cir. 1996)...........................................................................................................23

*Tarter v. Navigators Ins. Co.*,
    No. 21-5129, 2021 WL 4950375 (6th Cir. Oct. 25, 2021) ..................................12, 15

*TriTech Software Sys. v. U.S. Specialty Ins. Co.*,
   No. CV10-00094-R, 2010 WL 5174371 (C.D. Cal. Dec. 13, 2010) .................................17, 18

*U.S. TelePacific Corp. v. U.S. Specialty Ins. Co.*,
   No. CV 18-5083-DMG, 2019 WL 2590171 (C.D. Cal. June 18, 2019), *aff'd*,
   815 F. App'x 155 (9th Cir. 2020) .........................................................................17, 21, 23, 24

*United Farm Workers of Am. v. Hudson Ins. Co.*,
   No. 1:18-CV-0134-JLT, 2019 WL 1517568 (E.D. Cal. Apr. 8, 2019).............................21, 22

*Verizon Comms. Inc. v. Illinois Nat'l Ins. Co.*,
   No. CVN14C06048WCCCCLD, 2017 WL 1149118 (Del. Super. Ct. Mar. 2,
   2017), *rev'd on other grounds*, 222 A.3d 566 (Del. 2019) ......................................................23

*XL Specialty Ins. Co. v. Agoglia*,
   No. 08-cv-3821-GEL, 2009 WL 1227485 (S.D.N.Y. Apr. 30, 2009), *aff'd sub
   nom., Murphy v. Allied World Assur. Co. (U.S.), Inc.*, 370 F. App'x 193 (2d
   Cir. 2010) ....................................................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................................10

## I.      __INTRODUCTION__

The Seabury Plaintiffs ("Seabury") seek insurance coverage in this action for an arbitration brought against them by the minority shareholders in a joint venture in which Seabury was the majority shareholder. The essence of the arbitration was that Seabury exercised control over the joint venture to improperly diminish the interests of the minority shareholders and to force them out. Seabury and the minority shareholders are both insureds under the directors and officers liability insurance policy issued by Defendant U.S. Specialty Insurance Company ("U.S. Specialty"). U.S. Specialty denied coverage in reliance on an "Insured v. Insured" exclusion that broadly bars coverage for Claims brought by any insured against another insured. The exclusion shields U.S. Specialty from exposure to corporate infighting between insureds, like the arbitration.

Seabury seeks to avail itself of a narrow exception to the exclusion that restores coverage for Claims for Employment Practices Wrongful Acts, a defined term which uses other defined terms, like Retaliation, Wrongful Termination, and Workplace Tort, to capture a variety of typical causes of action an employee can bring against his or her employer.[1] As part of this effort, Seabury tries to use a collection of stray allegations and evidence in order to shoehorn the arbitration within the scope of the exception. It cannot do so because the arbitration is a classic business dispute between competing shareholders and does not seek relief "for" any Employment Practices Wrongful Acts. Seabury's claim for coverage fails as a matter of law for three reasons.

*First*, the exclusion and the exception thereto apply to "Claims," and the operative "Claim" here is the arbitration, not its constituent parts. The policy unambiguously defines "Claim" to make each proceeding, like the arbitration, a single "Claim." Seabury cannot break the arbitration into multiple "Claims" based on each statement made by the claimants or their counsel during the

---

[1] Capitalized terms that are not otherwise defined herein are defined terms in the policy.

arbitration. Such an interpretation would render most of the "Claim" definition completely superfluous. Nor can Seabury rely on allegations made in letters it received years before the arbitration, because those allegations did not carry over to the arbitration proceeding and because any amounts incurred in defending against those allegations did not exceed the Policy's retention.

**Second**, it is undisputed that the arbitration was brought by insureds, placing it squarely within the insured v. insured exclusion. U.S. Specialty thus has met its burden of proving that the exclusion is triggered, and the burden shifts to Seabury to prove that the exception applies.

**Third**, Seabury cannot carry that burden because the narrow exception to the exclusion applies only to Claims "for" Employment Practices Wrongful Acts. This requires that the Claim seek relief "for" such acts, and not merely "arise out of" or be "brought about or contributed to" by such acts. The policy uses the latter, broader phrases to specify the scope of other policy provisions, but plainly uses narrower language to limit the reach of the exception. The arbitration does not seek relief for any Employment Practices Wrongful Acts, and instead seeks relief for the Seabury majority shareholders' alleged "squeeze-out" of the minority shareholders. Four of five counts in the arbitration demand are brought for breaches of the joint venture's operating agreement, breaches of the majority shareholders' fiduciary duties, and shareholder oppression. The fifth count, for constructive termination in violation of one claimant's **express** employment contract, does not change the result, because the "Wrongful Termination" definition does not include terminations in breach of express employment contracts. Seabury thus is forced to rely on bits and pieces of the arbitration record or statements preceding the arbitration, none of which can transform the arbitration into a Claim "for" Employment Practices Wrongful Acts. Nor can Seabury rely on hypothetical claims that were never made to manufacture coverage.

For all of these reasons, U.S. Specialty thus is entitled to summary judgment.

2

## II.    **BACKGROUND**

### A.    **The Policy**

U.S. Specialty issued Directors, Officers and Organization Liability Insurance Policy No. 14-MGU-14-A33184 to Seabury Group, LLC for a Policy Period of October 23, 2014 to October 23, 2015 (the "Policy"). (U.S. Specialty Stmt. of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("SOF") ¶1; ECF No. 1-1, Policy at 2 of 50). The Seabury Plaintiffs are Insured Organizations under the Policy. (SOF ¶76; ECF No. 1, Compl. ¶15). The relevant insuring clause in the "claims made" Policy applies to "Loss arising from Claims first made against [the Insured Organizations] during the Policy Period . . . for Wrongful Acts." (SOF ¶3). Coverage is thus triggered by the making of a Claim, not by the occurrence of any Wrongful Act. (*Id.*)

The Policy defines "Claim" to mean:

> (1)    any oral or written demand, including any demand for non-monetary relief,
>
> (2)    any civil proceeding commenced by service of a complaint or similar pleading,
>
> (3)    any arbitration, mediation or other similar dispute resolution proceeding,
>
> (4)    any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,
>
> (5)    any criminal proceeding commenced by the return of an indictment, or
>
> (6)    any appeal from any proceeding referred to in this DEFINITION (B).

(SOF ¶6; ECF No. 1-1 at 33 of 50).

Condition (C) in the Policy provides that Claims alleging or arising out of the same or related facts, circumstances, situations, transactions or events shall be deemed a single Claim first

made when the earliest such Claim was made. (SOF ¶9). Policy Condition (B)(1) requires, as a condition precedent to coverage, the provision of timely written notice of any Claim. (*Id*. ¶8).

The Policy contains several exclusions, one of which, Exclusion (F), is central to the present motion. That exclusion, the "Insured v. Insured Exclusion," bars coverage for claims brought by Insureds against other Insureds, subject to narrow exceptions:

> the Insurer will not be liable to make any payment of Loss in connection with a Claim . . . brought by or on behalf of, or in the name or right of, the Insured Organization, whether directly or derivatively, or any Insured Person, unless such Claim is: . . . (3) for an actual or alleged Employment Practices Wrongful Act . . .

(*Id*. ¶7; ECF No. 1-1 at 21, 38 of 50). Exception (3) (the "Exception") forms the core of the dispute between Seabury and U.S. Specialty, and applies only to a Claim that is "for" an actual or alleged Employment Practices Wrongful Acts. (*Id*.). The Policy's use of the word "for" in the Exception contrasts with the Policy's use of broader, alternative formulations to specify the scope of other Policy exclusions or exceptions thereto, including the phrases "arising out of, based upon or attributable to," and "brought about or contributed to by." (SOF ¶7; ECF No. 1-1 at 37-39 of 50).[2]

The Policy defines Employment Practices Wrongful Act through other defined terms, including Retaliation, Workplace Tort, and Wrongful Termination. (SOF ¶6). "Retaliation" is defined to mean "retaliatory treatment against an Employee of the Insured Organization on account of such Employee's exercise or attempted exercise of his or her rights under law." (*Id.*). "Workplace Tort" means "misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful

---

[2] The Policy also contains a breach of contract exclusion that includes a substantively identical exception for Claims "for" Employment Practices Wrongful Acts. (SOF ¶7; ECF No. 1-1 at 40 of 50). Any analysis of that exclusion is unnecessary, because if the Exception to the Insured v. Insured Exclusion were held to apply, the exception in the contract exclusion would also apply. U.S. Specialty thus focuses this motion solely on the Insured v. Insured Exclusion.

4

discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the Insured Organization." (*Id.*). "Wrongful Termination" is defined to include "actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any Employee, which is in violation of law, against public policy or ***in breach of an implied agreement*** to continue employment" (*id.* (emphasis added)), but does not refer to actual or constructive termination in breach of an ***express*** employment agreement. (*Id.*)

The Policy is not a "duty to defend" policy and instead places the "duty to defend" on the Insureds. (*Id.* ¶10). The Policy provides that in the event of a covered Claim, U.S. Specialty "will pay covered Defense Costs on an as-incurred basis." (*Id.*). U.S. Specialty has no liability under the Policy until the Insureds incur Loss exceeding the applicable retention. (*Id.* ¶4). There is a $250,000 retention for each Claim for an Employment Practices Wrongful Act. (*Id.* ¶5).

### B.    The Shareholder Dispute

This coverage action arises from a shareholder dispute between the majority and minority shareholders in a joint venture, Seabury FXone LLC ("SFX"), formerly known as Seabury Financial Solutions LLC. (*Id.* ¶¶12-14, 40, 60, 77). SFX is in the business of developing software for the foreign exchange market. (*Id.* ¶11). Seabury Asset Management LLC and Seabury International Capital Holdings LLC allegedly were the majority shareholders in SFX. (*Id.* ¶14; Award, Ex. 2 at G0000001439 ¶142, G0000001441 ¶146, G0000001446 ¶151; Demand for Arbitration, Ex. 3 ¶18). The minority shareholder was Rosario Ingargiola ("Ingargiola"), through his company FXOne LLC ("FXOne"). (SOF ¶13; Award, Ex. 2 at G0000001396 ¶4). The SFX joint venture was governed by a Limited Liability Company Agreement (the "Operating Agreement"), which sets forth the majority and minority shareholders' rights and obligations. (SOF ¶¶21, 24). Ingargiola was SFX's initial CEO pursuant to a written employment agreement (the "Employment Agreement") that was never amended. (*Id.* ¶¶15-17).

In August 2015, while Ingargiola was SFX's CEO, Ingargiola's attorneys sent a letter to SFX's directors alleging "serious corporate misconduct at the hands of Seabury [] and other affiliates of [SFX], and stakeholders of the parent who sit on the Board . . . ." (*Id.* ¶¶25-27). The letter contains "very little in the way of concrete allegation[s]," and complains of a "robust range" of misconduct that includes Seabury's alleged effort to steal SFX's intellectual property, breaches of fiduciary duty, and interference with Ingargiola's efforts to perform as CEO for the benefit of the joint venture. (*Id.* ¶¶27-29; Ex. 1 at 146:7-146:18). The letter demands mediation, and thus is referred to as the "Mediation Demand." (SOF ¶30). The mediation ended in an impasse. (*Id.* ¶34).

Nearly three years later, Ingargiola and FXOne (the "Minority Shareholders") filed a Demand for Arbitration (the "Arbitration Demand") commencing an arbitration proceeding (the "Arbitration") against Seabury and Seabury's appointed members on SFX's board. (SOF ¶35). The Arbitration Demand alleges that just as SFX began to successfully commercialize its trading platform software product, Seabury began to refuse to provide necessary funding, refused to allow Ingargiola to look for alternative sources of funding, demanded that Ingargiola decrease SFX's expenses, and schemed to divert SFX's technology and business opportunities to an entity solely controlled by Seabury. (*Id.* ¶37; Ex. 2 at G0000001160-61 ¶¶8-10). In response to these efforts, Ingargiola allegedly resigned as SFX's CEO. (SOF ¶37; Ex. 2 at G0000001161 ¶11). The Arbitration Demand further alleges that after Seabury "squeez[ed]" out the Minority Shareholders, Seabury continued to frustrate the Minority Shareholders' rights by refusing to redeem FXOne's shares under the Operating Agreement, denying FXOne access to corporate records pursuant to its rights under the Operating Agreement, diminishing SFX's value, and diverting SFX's technology and business opportunities. (SOF ¶37; Ex. 2 at G0000001161-62 ¶12).

Based on these allegations, the Arbitration Demand asserts five counts against Seabury. (SOF ¶40). The first two counts are for breach of the Operating Agreement for failing to redeem the Minority Shareholders' shares in SFX and for failing to provide the Minority Shareholders access to SFX's books and records. (*Id.* ¶¶40-41; Ex. 3 at G0000001188-91 ¶¶91-101). The third count is for Seabury's alleged breach of its fiduciary duties owed as SFX's majority shareholders to the Minority Shareholders. (SOF ¶42; Ex. 3 at G0000001191 ¶¶102-05). This cause of action identifies twelve ways in which Seabury allegedly breached those duties and thereby "actively frustrated [SFX's] growth, reduced its value, squeezed out [the Minority Shareholders] from the company's management, and caused damage to [the Minority Shareholders]":

> (i) acting solely in the interests of the Seabury Majority Shareholders and the Seabury Managers, (ii) engaging in a secret scheme to create a competing entity to [SFX] in which [the Minority Shareholders] would have no interest, (iii) diverting company assets and intellectual property for the benefit of other Seabury entities without adequately compensating [SFX], (iv) creating competing entities and usurping [SFX's] corporate opportunities, (v) soliciting [SFX's] clients to competing entities in which [the Minority Shareholders] have no interest, (vi) engaging in a scheme to dilute [the Minority Shareholders'] shareholding by engineering low valuations for [SFX], (vii) violating [the Minority Shareholders'] contractual rights under the Operating Agreement, (viii) mismanaging [SFX], (ix) failing to adequately fund [SFX] or permit [SFX] to obtain outside capital, (x) constructively terminating Mr. Ingargiola as CEO and removing him as FXOne's representative on the [SFX] Board of Managers, (xi) excluding [the Minority Shareholders] from the business operations of and decision-making process for [SFX], and (xii) denying [the Minority Shareholders] access to information concerning [SFX] and to which they are entitled as shareholders.

(SOF ¶42; Ex. 3 at G0000001191 ¶104). The fourth count, for shareholder oppression, asserts that the same conduct constituted shareholder oppression by Seabury against the Minority Shareholders. (SOF ¶42; Ex. 3 G0000001192 ¶108). The final count alleges that Seabury compelled Ingargiola to resign, thereby constructively terminating him in violation of his

Employment Agreement, without cause. (SOF ¶43; Ex. 3 G0000001193-94 ¶¶113-14). Pursuant to Sections 8.2 and 8.3 of the Operating Agreement, the Minority Shareholders sought relief including a redemption of their shares in SFX based on a fair-market valuation over a five-year period. (SOF ¶41; Ex. 3 at G0000001189 ¶¶93-94, 98). Pursuant to Sections 6(a) and 6(b) of the Employment Agreement, Ingargiola also sought recovery of "unpaid salary, unused vacation, unpaid bonuses, and 12 months of his base salary." (SOF ¶43 at G0000001194 ¶114).

The Minority Shareholders never amended the Arbitration Demand, but voluntarily dismissed the SFX board members, so that the Arbitration proceeded solely against Seabury. (SOF ¶44). The Minority Shareholders consistently characterized the Arbitration as concerning a "textbook example of minority shareholder-freezeout." (SOF ¶¶46, 50; Pre-Hrg. Brief, Ex. 6 at G0000063607; Feb. 3, 2020 Hrg. Tr., Ex. 7 at 8:19-8:22, 9:4-10:5, 12:17-12:23; *accord* SOF ¶¶54, 57, 60-61; Ex. 1 at 129:21-129:24, 130:7-130:11, 154:15-154:19, 154:21, 155:10-155:15, 155:17-155:22, 155:24; Ex. 2 at G0000001398 ¶¶9-10, G0000001438 ¶138, G0000001439 ¶142). In their pre- and post-hearing briefs and at the hearing, the only specific monetary relief which the Minority Shareholders requested was a buy-out of their shares. (SOF ¶¶48, 51, 53; Ex. 6 at G0000063713; Ex. 7 at 77:25-78:6; Post-Hrg. Br., Ex. 8 at G0000063830-33).

In August 2020, the arbitrator issued a "closely-reasoned" 72-page arbitration award (the "Award"). (SOF ¶55). The Award summarizes the Minority Shareholders' allegations as follows:

> Ultimately, Mr. Ingargiola claims that [Seabury], as part of [its] conspiracy to steal FXOne's technology, threatened a withdrawal of funding and constructively terminated him from his employment as CEO, leaving [Seabury] and their affiliates in complete control of FXOne's valuable assets. [Seabury] then usurped corporate opportunities belonging to SFX, reorganized the company, and began to exploit the FX[One] business to the detriment of both SFX and FXOne as the minority member. Mr. Ingargiola also claims that FXOne's equity interest was improperly diluted by reason of

Seabury's infusions of capital coupled with low company valuations after Mr. Ingargiola's departure.

[The Minority Shareholders] contend that the above conduct constitutes breaches of contract, breaches of the fiduciary duties that the managers owed to [the Minority Shareholders] and to SFX, theft of corporate opportunities. . ., and [Seabury's] oppression of the minority unit holder. As a result, [the Minority Shareholders] seek the equitable remedy of a forced buyout of FXOne's equity position at fair market value as of the date of Mr. Ingargiola's departure.

(SOF ¶57; Ex. 2 at G0000001398 ¶¶9-10). The Award further observed that the "nub" of the Minority Shareholders' breach of fiduciary duty allegations was that Seabury "failed to act in SFX's best interests by not continuing to fund the company when it was on the cusp of success and, instead, acted in [its] own self-interest to the detriment of SFX." (Ex. 2 at G0000001455 n.47). The arbitrator concluded that the "major issue" is whether the Minority Shareholders are entitled to a buyout of their shares. (SOF ¶61; Ex. 2 at G0000001439-40 ¶142). Seabury does not disagree with the arbitrator's factual findings or conclusions. (*See* SOF ¶59; Ex. 1 at 162:5-162:21).

Indeed, the arbitrator ruled in Seabury's favor, holding that while Ingargiola was constructively terminated in violation of the Employment Agreement, and thus was entitled to retain his indirect shares in SFX pursuant to the Operating Agreement, the Minority Shareholders were not entitled to a buy-out of their shares because Seabury had not breached any fiduciary duties owed to them or committed shareholder oppression. (SOF ¶¶62-63; Ex. 2 at G0000001459 ¶183, G0000001460 ¶185, G0000001461 ¶¶187-88, G0000001462 ¶190, G0000001466 §§ VIII.A, VIII.B). The arbitrator further concluded that Ingargiola was not entitled to relief under the Employment Agreement because he never executed a release when he resigned as CEO. (SOF ¶64; Ex. 2 at G0000001464 ¶196). In declining to award costs, the arbitrator found that the "clear majority of the claims and defenses arose out of the [Operating Agreement], as did the allegations of breaches of fiduciary duty and minority oppression." (SOF ¶65; Ex. 2 at G0000001466 ¶202).

9

C.   **Seabury's Requests for Coverage for the Shareholder Dispute**

Seabury provided notice under the Policy of the Mediation Demand. (SOF ¶66). U.S. Specialty responded with a letter reserving "all rights and defenses available under the [P]olicy and otherwise, including the right to raise additional issues that may affect coverage." (*Id*. ¶67). Seabury's aggregate legal fees and costs in responding to the Mediation Demand, attending the mediation, and all other tasks preceding the Arbitration, total far less than the $250,000 retention for any Claims for Employment Practices Wrongful Acts. (SOF ¶¶70-72; Ex. 11 at P000001-37). U.S. Specialty thus was never called upon to further respond at this stage.

When the Arbitration was filed three years after the Mediation Demand, Seabury provided notice to U.S. Specialty and forwarded the Arbitration Demand. (SOF ¶69). Although the Arbitration was filed after the Policy Period, Seabury and U.S. Specialty agree that the Arbitration is deemed part of a single Claim first made during the Policy Period, at the time of the Mediation Demand, pursuant to Policy Condition (C). (*Id*. ¶73). After analyzing the more detailed allegations in the Arbitration Demand, U.S. Specialty invoked the Insured v. Insured Exclusion to deny coverage. (*Id*. ¶74). Seabury contested this denial. (*Id*. ¶75). Other than providing notice of the Arbitration Demand, Seabury never provided notice of any other purported Claim in connection with the Arbitration. (*Id*. ¶¶78-79; Ex. 5 at Nos. 28-30). Because the Award was entered in Seabury's favor, Seabury's claim for coverage is limited to reimbursement of Seabury's alleged Defense Costs in responding to the Mediation Demand and the Arbitration. (SOF ¶77).

III.   **ARGUMENT**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The undisputed facts show that the Insured v. Insured Exclusion bars coverage for the operative Claim—the Arbitration—and that the Arbitration does not fall within the narrow scope of the

Exception because it is not a Claim "for" Employment Practices Wrongful Acts. Seabury's sole cause of action against U.S. Specialty for breach of contract therefore fails as a matter of law, and U.S. Specialty is entitled to summary judgment.

### A.     The Insured v. Insured Exclusion And The Exception Thereto Require Analysis Of The Operative "Claim," Which Is The Arbitration Proceeding.

The threshold issue in applying the Insured v. Insured Exclusion and the Exception—and the lens through which those provisions are applied—is what "Claim" or "Claims" are at issue, because the Exclusion applies to Loss in connection with "a ***Claim*** . . . brought by or on behalf of, or in the name or right of, the Insured Organization . . . or any Insured Person," and the Exception applies to a "***Claim*** . . . for an actual or alleged Employment Practices Wrongful Act." (SOF ¶7; ECF No. 1-1 at 21, 38 of 50) (emphasis added). Seabury implies that each "oral or written demand" made by the Minority Shareholders or their counsel over the two-year course of the Arbitration could qualify as a "Claim" under the Policy. (Apr. 7, 2022 Hrg. Tr., Ex. 12 at 4:1-6:3, 9:20-11:12, 13:18-14:6; ECF. No. 52, Seabury's Pre-Mot. Conf. Ltr., at 2-3; ECF No. 55, Seabury's Pre-Mot. Conf. Resp. Ltr. at 1-2.). Seabury also continues to rely on correspondence sent years prior to the Arbitration, including the Mediation Demand. For the following reasons, the only operative "Claim" here is the Arbitration proceeding.

As noted above, the Policy defines "Claim" by using six prongs that identify six alternative types of Claims, including "any oral or written demand," four types of proceedings including "any arbitration, mediation or other similar dispute resolution proceeding," and appeals from the referenced types of "proceedings." (SOF ¶6; ECF No. 1-1 at 33 of 50). The definition's use of the word "or" to separate the prongs means that one and not multiple prongs are intended to apply to any "Claim." *See Market Street Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 955 (7th Cir. 2020); *see also Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010) ("or" is

disjunctive). Prong (3) of the Claim definition unambiguously makes "any arbitration, mediation or other similar dispute resolution proceeding" a single Claim, just as a "civil proceeding" is a single Claim under prong (2), a "criminal proceeding" a single Claim under prong (5), *etc.*

Courts construing similar Claim definitions, including when applying similar "insured v. insured" exclusions, have repeatedly held that a single proceeding is a single "Claim" to which the exclusion must be applied. *See, e.g.*, *XL Specialty Ins. Co. v. Agoglia*, No. 08-cv-3821-GEL, 2009 WL 1227485, at *8 (S.D.N.Y. Apr. 30, 2009) (in holding that prior knowledge exclusions barred coverage for a lawsuit, reasoning that "a 'claim' is defined as a legal proceeding and not, as the insureds would have it, as each separate portion of a complaint"), *aff'd sub nom., Murphy v. Allied World Assur. Co. (U.S.), Inc.*, 370 F. App'x 193 (2d Cir. 2010);[3] *Tarter v. Navigators Ins. Co.*, No. 21-5129, 2021 WL 4950375, at *2-3 (6th Cir. Oct. 25, 2021) (insured v. insured exclusion must be applied to the entire proceeding as a single "Claim"); *Jerry's Enters., Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 888 (8th Cir. 2017) (same); *Stoneburner v. RSUI Indem. Co.*, No. 2:21-CV-00023-DBB, 2022 WL 1091337, at *4 (D. Utah Apr. 12, 2022) (same); *Greenwich Ins. Co. v. Lecstar Corp.*, No. 1:05-cv-3275-RLV, 2006 WL 2052375, at *3 (N.D. Ga. July 20, 2006) (same); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis*, 296 F.3d 336, 341-42 (5th Cir. 2002) (a civil proceeding is a single "Claim," and an amended complaint is not a new "Claim"); *Cmty. Found. for Jewish Educ. v. Fed. Ins. Co.*, 16 F. App'x 462, 468 (7th Cir. 2001) (same).

Seabury implies that a different result should apply because prong (1) of the Claim definition refers to "oral or written demands," such that every allegation made during the course

---

[3] While the Policy was issued to Seabury in Minnesota (ECF No. 1-1 at 2 of 50), through a New York broker, U.S. Specialty is not aware of any conflict of laws between Minnesota and New York law on any issue raised in this motion. This brief thus cites to the law of the forum state. *See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

of the Arbitration might constitute a distinct Claim. But prong (1) cannot reasonably be applied to break the Arbitration into multiple "Claims," for three reasons.

*First*, under binding rules of policy interpretation, policy language cannot be interpreted in a manner that would render other policy language superfluous. *See Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citations omitted). Applying prong (1) to any proceeding addressed in prongs (2) through (6), including an arbitration, would impermissibly render those prongs superfluous. *See Market Street Bancshares*, 962 F.3d at 953-55 (a new claim in a civil proceeding is not a "Claim" under the "written demand" prong, because that would render the "civil proceeding" prong superfluous); *Stoneburner*, 2022 WL 1091337, at *4 (reaching same conclusion); *see also Fed. Ins. Co. v. DBSI, Inc. (In re DBSI, Inc.)*, No. 08-12687(PJW), 2012 WL 2501090, at *7 (Bankr. D. Del. June 27, 2012) (an investigation is not a "Claim" under "written demand" prong, because that would render the "proceeding" prong redundant).

*Second*, prong (1) must be construed in light of the surrounding language in the Claim definition. *See Olin*, 704 F.3d at 99. The Claim definition uses the disjunctive "or" to separate "any oral or written demand" and the proceedings addressed in prongs (2) through (6). (SOF ¶6; ECF No 1-1 at 33 of 50). Prong (1) thus cannot reasonably apply to proceedings addressed in prongs (2) through (6). *See Market Street Bancshares*, 962 F.3d at 955 (relying on use of disjunctive in a similar "Claim" definition to hold that a "written demand" prong could not apply to a part of a civil proceeding); *Stoneburner*, 2022 WL 1091337, at *4 ("a plain reading of the three claim definitions suggests that they are separate"). Moreover, prong (6) extends coverage for appeals "from any ***proceeding*** referred to in this DEFINITION." (SOF ¶6; ECF No 1-1 at 33 of 50) (emphasis added). Prong (1) is the only prong that does not refer to a "proceeding," and prong (6) thus does not extend coverage for any appeal from an "oral or written demand" in prong (1). This

13

result would make no sense if prong (1) were intended to apply to proceedings or parts thereof. *Kephart v. Certain Underwriters at Lloyd's of London*, 427 F. Supp. 3d 508, 515 (S.D.N.Y. 2019) (quoting *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006)) ("In interpreting contracts, 'words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.'").

***Third***, another reason that prong (1) cannot reasonably be interpreted to divide an arbitration or any other proceeding into multiple "Claims" is that doing so would be completely unworkable—as evidenced by Seabury's inability to identify the discrete "oral or written demands" made over the course of the two-year Arbitration that Seabury implies are "Claims." (Ex. 12 at 4:1-6:3, 9:20-11:12, 13:18-14:6). Separate retentions generally apply to each distinct Claim under the Policy. Applying separate retentions to each distinct demand in a single proceeding would be unwieldy and often could render coverage illusory for the insured by stacking multiple retentions so that policy proceeds could never be accessed. The only reasonable interpretation – and the one that promotes a clear understanding between the parties – is that a single arbitration or proceeding is a single "Claim."

The Arbitration thus is a single "Claim," which must be analyzed under the Insured v. Insured Exclusion and the Exception. The Arbitration is also the only ***operative*** Claim that the Court need consider in order to decide this case. While the Mediation Demand is also a "Claim," pursuant to the "oral or written demand" prong of the Claim definition, the Mediation Demand and any other correspondence exchanged before the Arbitration is irrelevant for two reasons.

***First***, any "Defense Costs" attributable to the Mediation Demand and subsequent pre-Arbitration correspondence would be limited to amounts resulting from Seabury's investigation or defense of those letters. (SOF ¶6; ECF No. 1-1 at 34 of 50). The invoices that reflect Seabury's

14

work in responding to the Mediation Demand and all other tasks prior to the filing of the Arbitration total less than $100,000, which is far short of the $250,000 retention for any purported Claim for Employment Practices Wrongful Acts. (SOF ¶¶70-72; Invoices, Ex. 11 at P000001-37).

*Second*, even if the Mediation Demand and Arbitration were considered together as part of the same "Claim" pursuant to Condition (C), the vague and less-developed allegations in the Mediation Demand were replaced by the Arbitration Demand when filed. *See*, *e.g.*, *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 141 (2d Cir. 2014) (analyzing coverage based on operative allegations in amended complaint); *cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir.1977)) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."). Coverage thus must be determined by what the Arbitration was a Claim "for," and not by any correspondence sent years before the Arbitration was commenced.

## B.   The Claim Was Brought By Insureds Against Insureds, And Thus Falls Squarely Within The Plain Scope Of The Insured v. Insured Exclusion.

It is undisputed that the Arbitration falls squarely within the Insured v. Insured Exclusion, subject to the Exception. (SOF ¶75; ECF No. 52 at 2; ECF No. 55 at 1). The exclusion applies to any Claim "brought by or on behalf of, or in the name or right of" any insured under the Policy. (*Id.* ¶7; ECF No. 1-1 at 21, 38 of 50). The Arbitration was brought by the Minority Shareholders, who are insureds, against the Seabury entities, which are also insureds. (SOF ¶¶35, 76; ECF No. 1 ¶¶15, 40-41, 49-50). This places the Arbitration squarely within the exclusion. *See*, *e.g.*, *Levy v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 889 F.2d 433, 434–35 (2d Cir. 1989) (applying insured v. insured exclusion to lawsuit brought by insured); *Tarter*, 2021 WL 4950375, at *2-3 (same); *Jerry's Enters., Inc.*, 845 F.3d at 888 (same). U.S. Specialty thus has met its burden of proving that the exclusion is triggered, and the burden shifts to Seabury to prove that the Exception

15

applies. *Dish Network Corp. v. ACE Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (citation and

quotations omitted) (insured has burden to prove that exception to exclusion applies).

### C.   The Claim Was Not "For" Employment Practices Wrongful Acts And Thus Does Not Fall Within The Exception To The Insured v. Insured Exclusion.

Seabury cannot meet its burden of proving that the Arbitration is a Claim "for"

Employment Practices Wrongful Acts, and thus seeks to broaden the scope of the Exception

beyond what its plain language can bear, and to mischaracterize the Arbitration in order to

shoehorn it within the Exception.

#### 1.   The Exception Narrowly Applies To Claims "For" Employment Practices Wrongful Acts, And Does Not Apply More Broadly To Claims "Arising Out Of" Or "Involving" Such Acts.

Seabury's entire case rests on its repeated assertions that the Arbitration "involves"

Employment Practices Wrongful Acts. (ECF No. 1 ¶¶56, 86, 89, 92, 95, 105). However, the

Exception does not apply to Claims *involving* Employment Practices Wrongful Acts; it

unambiguously applies only to "Claim[s] . . . *for* an actual or alleged Employment Practices

Wrongful Act." (SOF ¶7; ECF No. 1-1 at 21, 38 of 50) (emphasis added).

This plain language must be applied as written and in light of the surrounding language in

the Policy, which must be construed as a whole. *Global Reins. Corp. of Am. v. Century Indem.

Co.*, 22 F.4th 83, 95 (2d Cir. 2021). The Policy's use of narrow language to limit the Exception to

Claims "for" Employment Practices Wrongful Acts contrasts with the Policy's use of much

broader language to fix the scope of other policy provisions, such as "arising out of, based upon

or attributable to" or "brought about or contributed to by." (SOF ¶7; ECF No. 1-1 at 37-39 of 50).

The plain meaning of the Exception is that a Claim must seek relief "for" an Employment Practices

Wrongful Act, and cannot merely arise out of, be brought about or contributed to by, or even more

broadly merely involve any such Act. Another court recently reached precisely this conclusion,

applying the same binding rules of construction under another state's laws to an identical exception in an insured v. insured exclusion in another U.S. Specialty D&O policy. *U.S. TelePacific Corp. v. U.S. Specialty Ins. Co.*, No. CV 18-5083-DMG (AGRx), 2019 WL 2590171, at \*9-10 (C.D. Cal. June 18, 2019), *aff'd*, 815 F. App'x 155 (9th Cir. 2020).

In *U.S. TelePacific*, the insured sought to take individual allegations in an underlying action out of context in order to assert that the action was a Claim "for" Employment Practices Wrongful Acts. *Id.* The court rejected those efforts because the causes of action pled in the suit did not seek relief "for" any Employment Practices Wrongful Acts. *Id.* The court reasoned that the insured's effort to rely on individual allegations "stretches the Policy and the underlying claims too far," including by "contort[ing]" the word "for" in the Exception so it would be indistinguishable from the broader language used to define the scope of other policy provisions. 2019 WL 2590171 at \*9.

The present Court and other courts have reached the same result when construing similar or identical policy provisions. In *Certain Underwriters at Lloyd's, London v. Convergys Corp.*, No. 1:12-cv-08968-CRK, 2014 WL 3765550 (S.D.N.Y. Mar. 25, 2014), this Court held that an exception "for" certain consumer privacy protection law claims did not apply where the underlying lawsuit did not seek relief "for" any such violations. *Id.* at \*4-5. The insured in *Convergys* asserted that "for" could be satisfied where the underlying lawsuit "alleges actions or events that would constitute" a violation of one of the laws within the exception, regardless of whether the suit sought relief "for" such violations. This Court rejected that argument, observing that "[the insured's] interpretation asks too much of the word 'for.'" *Id.* at \*5. In *TriTech Software Systems v. U.S. Specialty Insurance Co.*, No. CV10-00094-R, 2010 WL 5174371 (C.D. Cal. Dec. 13, 2010), the court held that an exception identical to the Exception here in an insured v. insured exclusion in another U.S. Specialty D&O insurance policy did not apply because the underlying action did not

seek relief for or require proof of any Employment Practices Wrongful Act. *Id.* at *5. Other courts have reached similar conclusions. *See, e.g., Jarden, LLC v. ACE Am. Ins. Co.*, No. CVN20C03112AMLCCLD, 2021 WL 3280495, at *5-6 (Del. Super. Ct. July 30, 2021) (appraisal action did not require proof of any Wrongful Acts and thus was not a Claim "for" Wrongful Acts), *aff'd*, No. 273-2021, 2022 WL 618962 (Del. Mar. 3, 2022); *RSUI Indem. Co. v. Desai*, No. 8:13-CV-2629-T-30TGW, 2014 WL 4347821, at *4 (M.D. Fla. Sept. 2, 2014) ("for" means "in response to; as a requital of").

### 2.   The Claim Was For A Majority Shareholder "Squeeze-Out" Of The Minority Shareholders, And Was Not "For" Any Employment Practices Wrongful Act.

The Arbitration Demand commenced the Arbitration and established the scope of the relief sought by the Minority Shareholders therein. *See In re Pana-Oro, S.A.*, No. 85 CIV. 9059 (CBM), 1986 WL 2791, at *2 (S.D.N.Y. Feb. 21, 1986); JAMS Comprehensive Arbitration Rule 9(a) (2014 ed.) ("Each Party shall afford…timely notice of its claims….No claim…will be considered…in the absence of such prior notice"), (b) ("Claim's notice of claims is the Demand….It shall include a statement of the remedies sought."), *available at*, https://www.jamsadr.com/files/Uploads /Documents/JAMS-Rules/JAMS_comprehensive_arbitration_rules-2014.pdf.[4]   The   Minority Shareholders never amended their Arbitration Demand, and the Award confirms that the scope of their Claim did not materially change during the Arbitration. (SOF ¶44; Ex. 1 at 102:3-102:13; Ex. 2 at G0000001397 ¶7, G0000001401 ¶20).

The first four counts in the Arbitration Demand form the core of the shareholder dispute presented in the Arbitration. The first two counts seek relief for breach of the joint venture Operating Agreement for Seabury's failures to redeem the Minority Shareholders' shares in SFX

---

[4] The Court should take judicial notice of the JAMS Rule because it is a matter of public record and is not subject to reasonable dispute. *See, e.g., In re Pana-Oro, S.A.*, 1986 WL 2791, at *2.

and to give the Minority Shareholders access to SFX's books and records. (SOF ¶¶40-41; Ex. 3 at G0000001188-91 ¶¶91-101). These counts are part of a business dispute and do not make the Arbitration a Claim "for" Employment Practices Wrongful Acts. The third count seeks relief for Seabury's breach of fiduciary duties owed as SFX's majority shareholder to the Minority Shareholders, and the fourth count seeks relief for shareholder oppression. (SOF ¶42; Ex. 3 at G0000001191 ¶¶102-08). Again, these counts seek relief between shareholders in their capacities as such, and do not make the Claim "for" any Employment Practices Wrongful Act.

Consistent with these counts, the Minority Shareholders repeatedly described the Arbitration as being a "case about the squeeze out of a minority shareholder by a majority shareholder. . . And so the remedy that we're seeking . . . is a buyout . . . ." (SOF ¶¶47-48, 50-51, 53-54; *accord* Ex. 1 at 129:21-129:24, 130:7-130:11, 154:15-154:19, 154:21, 155:10-155:15, 155:17-155:22, 155:24; Ex. 6 at G0000063694, G0000063713 Ex. 7 at 8:19-8:22, 9:4-10:5, 12:17-12:23, 77:25-78:6; Ex. 8, at G0000063830-33). The Award similarly concluded that the "major issue" in the Arbitration is whether the Minority Shareholders are entitled to a buyout of FXOne's shares (SOF ¶61; Ex. 2 at G0000001439-40 ¶142), and concluded that the "clear majority of the claims and defenses arose out of the [Operating Agreement], as did the allegations of breaches of fiduciary duty and minority oppression." (SOF ¶65; Ex. 2 at G0000001466 ¶202). The Arbitration was a shareholder dispute, and not a Claim "for" any Employment Practices Wrongful Act.

The fifth and final count in the Arbitration Demand, which sought relief for an alleged constructive termination in breach of Ingargiola's express employment contract, does not change this result. While "Employment Practices Wrongful Act" is defined in part to include "Wrongful Termination," the Policy's definition of "Wrongful Termination" does ***not*** include constructive terminations in violation of ***express*** employment contracts. The Policy instead defines "Wrongful

Termination" to mean "actual or constructive termination of [] employment … in violation of law, against public policy *or in breach of an implied agreement* to continue employment." (SOF ¶6) (emphasis added). "In violation of law" or "against public policy" cannot be construed to apply to breaches of contracts or agreements without impermissibly rendering "in breach of an implied agreement" meaningless. *See Global Reins.*, 22 F.4th at 95 (policy language must be interpreted in light of, and without rendering superfluous, surrounding policy language); *Olin*, 704 F.3d at 99 (same); *CIM Ins. Corp. v. Midpac Auto Ctr., Inc.*, 108 F. Supp. 2d 1092, 1104 (D. Haw. 2000) (breach of express employment contract not covered where policy defined "wrongful employment practice" as breach of an "implied agreement" and otherwise barred contract claims).

Because Seabury cannot prove that the Arbitration is a Claim "for" any Employment Practices Wrongful Acts, it instead has relied on individual allegations or evidence, none of which suffice to transform the Arbitration into a Claim "for" Employment Practices Wrongful Acts.

*First*, Seabury has asserted that a "Wrongful Termination" was alleged because one of the twelve ways in which it allegedly breached its fiduciary duties and oppressed the Minority Shareholders' rights included "constructively terminating" Ingargiola. (SOF ¶42; Ex. 3 at G0000001191-92 ¶¶104, 108). However, that snippet does not transform the shareholder fiduciary duty and oppression counts into a Claim "for" an Employment Practices Wrongful Act. Ingargiola allegedly was constructively terminated in violation of his *express* employment contract, which is not a "Wrongful Termination." *See supra*. Nothing in the Arbitration Demand seeks relief *for* constructive termination in violation of law, public policy, or an implied agreement, as required by the "Wrongful Termination" definition. *See Convergys*, 2014 WL 3765550, at *4-5 (rejecting similar argument by insured where relief was not sought "for" any violation of the laws in question). And in any event, the Arbitrator reasoned that the "nub" of the fiduciary duty count was

Seabury's acting in its own best interests, instead of the joint venture's, when the joint venture was on the cusp of success. (Ex. 2 at G0000001455 n.47). That is not an employment claim.

**Second**, Seabury asserts that a Claim for "Retaliation" has been made, but the Arbitration does not seek relief "for" any alleged "Retaliation," which is defined to mean "retaliatory treatment against an Employee . . . on account of such Employee's exercise or attempted exercise of his or her rights under law." (SOF ¶6; Ex. 3 ¶¶91-114). Seabury relies on an isolated allegation in a letter sent years before the Arbitration commenced, but that does not support its position, because no relief was sought during the Arbitration for any alleged retaliation. *See*, *e.g.*, *United Farm Workers of Am. v. Hudson Ins. Co.*, No. 1:18-CV-0134-JLT, 2019 WL 1517568, at *15 (E.D. Cal. Apr. 8, 2019) (abandoned cause of action for retaliation did not suffice to create coverage for lawsuit).

**Third**, Seabury cites to the "Workplace Tort" subpart of the Employment Practices Wrongful Act definition, but that does not apply because it is limited to a handful of employment-related torts including misrepresentation, defamation, invasion of privacy, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, "***if actually or allegedly related to the claimant's employment*** by the Insured Organization." (SOF ¶6) (emphasis added). Torts outside the employment context do not qualify. *Id.*; *see*, *e.g.*, *Penn Psychiatric Ctr., Inc. v. United States Liab. Ins. Co.*, 257 A.3d 1241, 1252 (Pa. Super Ct. 2021). The Arbitration does not seek relief for any Workplace Torts. The Arbitration instead seeks to vindicate the Minority Shareholders' alleged rights, in their capacities as minority shareholders of SFX, against the Seabury majority shareholders. (Ex. 3 ¶¶91-111). The only count that Ingargiola asserted in his capacity as a former employee was for constructive termination in breach of an express employment agreement, which does not seek relief "for" any tort referenced in the "Workplace Tort" definition. (*Id.* ¶¶112-14); *U.S. TelePacific*, 815 F. App'x at 158 (suit was

not "for" a "Workplace Tort" when none of the causes of action required proof of any "Workplace Tort"); *United Farm Workers*, 2019 WL 1517568, at *16 ("misrepresentation and deceit were not elements of any of the causes of action identified in [the claimant's operative pleading]"). U.S. Specialty anticipates that Seabury thus will fall back on stray allegations or findings in the Arbitration in an effort to show the Arbitration involves a Workplace Tort, but that would not change the analysis because the Claim did not seek relief "for" any Workplace Tort.

### 3. Seabury Cannot Use The Duty To Defend "Potential For Coverage" Standard To Expand The Narrow Exception To The Exclusion.

Because Seabury cannot show that the Claim is "for" any Employment Practices Wrongful Act, it also seeks to lower the bar by asserting that the "potential for coverage" standard applicable to "duty to defend" policies would cause the Exception to apply so long as any Employment Practices Wrongful Act is merely mentioned in the Arbitration or any preceding letters. That argument fails because the "potential for coverage" standard does not apply to the Policy based on its plain language, also does not apply because the underlying Claim has been concluded, and in any event does not help Seabury because there was not even a potential for coverage here.

*First*, the "potential for coverage" standard does not apply under the plain language of the Policy. That standard typically applies to "duty to defend" policies, under which insurers must defend an entire claim when any "potential for coverage" exists. *Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 249 (S.D.N.Y. 2019) (citations omitted) (explaining that the duty to defend is triggered if there is a reasonable possibility of recovery under the policy), *aff'd*, 816 F. App'x 611 (2d Cir. 2020). The Policy here expressly disclaims the duty to defend, limits defense cost reimbursement coverage to "covered Defense Costs," and contains an allocation provision limiting such coverage only to "covered matters claimed against Insureds." (SOF ¶10; ECF No. 1-1 at 43 of 50). Under these plain policy provisions, which are incompatible with the

"duty to defend," the "potential for coverage" standard does not apply. *See U.S. TelePacific*, 2019 WL 2590171, at \*3-5, *aff'd*, 815 F. App'x at 157 (holding that identical provisions in another U.S. Specialty D&O policy are "impossible to square with [an insured's] proposed interpretation of the Policy to obligate [U.S.] Specialty to advance defense costs for any potentially covered claim."). Persuasive authority under New York law supports the same result. *See Petroterminal de Panama, S.A. v. Houston Cas. Co.*, 114 F. Supp. 3d 152, 158-59 (S.D.N.Y. 2015), *aff'd*, 659 F. App'x 46, 51 (2d Cir. 2016) ("[U]nder policies containing a duty to reimburse defense costs but not a duty to defend, the Insurers have a duty to reimburse defense costs for claims that are established to be covered through judgment and settlement, and not for claims only potentially falling within the policy's coverage."); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1219 (2d Cir. 1995), *opinion modified on denial of reh'g*, 85 F.3d 49 (2d Cir. 1996) ("The policies do not contemplate unconditional payment of defense costs for potentially covered claims").[5]

*Second*, the potential for coverage standard also does not apply when the underlying Claim has been concluded. *See, e.g.*, *Pan Pacific Retail Props., Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 970-71 (9th Cir. 2006). There is no "potential for coverage" for Claims that were never made; Seabury's only exposure was to the Claim that was made and now has been concluded.

*Third*, even if the potential for coverage standard were to be applied here, there was no potential for coverage. Under that standard, a "potential for coverage" exists when the facts alleged in the underlying complaint or known to the insurer create a potential for a covered loss. *Spandex*, 407 F. Supp. 3d at 249. Consequently, in "occurrence based" policies that place a "duty to defend"

---

[5] *See also Verizon Comms. Inc. v. Illinois Nat'l Ins. Co.*, No. CVN14C06048WCCCLD, 2017 WL 1149118, at \*6 & n.50-52 (Del. Super. Ct. Mar. 2, 2017) (citations omitted) (interpreting New York and California law as requiring actual coverage to trigger duty to advance and noting New York law has looked to California law in developing New York's duty-to-advance doctrine), *rev'd on other grounds*, 222 A.3d 566 (Del. 2019).

on the insurer and provide coverage for bodily injury or property damage caused by certain events, *see*, *e.g.*, *Spandex*, 407 F. Supp. 3d 242, the "potential for coverage" standard prevents coverage for an otherwise covered occurrence or event from being determined by the manner in which it is pled in the operative complaint. However, even in that context, a duty to defend "cannot be imposed 'through a strained, implausible reading of the complaint that is linguistically conceivable but tortured and unreasonable.'" *Id.* at 249 (*quoting Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 83 (2d Cir. 2006)).

The Policy here does not provide coverage for events or acts, and instead provides coverage for Claims "for" Wrongful Acts, and exempts Claims "for" Employment Practices Wrongful Acts from the Insured v. Insured Exclusion. (SOF ¶¶ 3, 7; ECF No. 1-1 at 21, 33, 38 of 50). Even if a "potential for coverage" standard were incorrectly applied here, it would require analysis of whether a Claim "for" an Employment Practices Wrongful Act potentially was made—not merely whether an Employment Practices Wrongful Act allegedly occurred. For the reasons discussed above, there is not even a potential for coverage under the Exception here. Deeming the Exception to be satisfied by the mere mention or hint of a purported Employment Practices Wrongful Act, irrespective of whether the Claim seeks relief "for" such Act, would dramatically expand the scope of the Exception beyond its plain language. It would thereby have the effect of extending the Exception to unpled, hypothetical claims that were never made, which is clearly is not what the plain language of the Policy contemplates. *See*, *e.g.*, *U.S. TelePacific*, 2019 WL 2590171, at *10.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, U.S. Specialty respectfully requests that the Court enter judgment in its favor on Seabury's sole count against U.S. Specialty for breach of contract.

Dated: May 13, 2022                    Respectfully Submitted,

*/s/* Joseph A. Bailey III
Joseph A. Bailey III (admitted *pro hac vice*)
Justin S. Levy (admitted *pro hac vice*)
CLYDE & CO US LLP
1775 Pennsylvania Avenue NW, 4th Floor
Washington, DC 20006
Telephone: 202-747-5100
Facsimile: 202-747-5150
E-mail: joseph.bailey@clydeco.us
E-mail: justin.levy@clydeco.us

Scott Schwartz
CLYDE & CO US LLP
405 Lexington Avenue, 16th Floor
New York, NY 10174
Telephone: 212-710-3900
Facsimile: 212-710-3950
E-mail: scott.schwartz@clydeco.us

*Attorneys for Defendant*
*U.S. Specialty Insurance Company*