UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEABURY FXONE LLC, SEABURY ASSET
MANAGEMENT LLC, SEABURY
INTERNATIONAL CAPITAL HOLDINGS
LLC,

                              Plaintiffs,

               – *against* –

U.S. SPECIALTY INSURANCE CO.,

                              Defendant.

**OPINION & ORDER**

21-cv-837 (ER)

RAMOS, D.J.:

        Seabury FXOne LLC, Seabury Asset Management LLC, and Seabury
International Capital Holdings LLC (collectively, "Seabury") initially brought this action
against insurance companies U.S. Specialty Insurance Co. ("U.S. Specialty") and RSUI
Indemnity Co. ("RSUI") for breach of contract, and, in the alternative, declaratory
judgment as to the indemnification obligations of RSUI.[1]  Complaint ("Compl."), Doc. 1
¶¶ 131–157.  Seabury alleges that U.S. Specialty improperly denied coverage for a claim
stemming from the attorneys' fees and other expenses it incurred in its defense of various
allegations brought by Rosario Ingargiola, the former CEO of Seabury FXOne LLC.  *Id.*
¶ 1.

        Before the Court is U.S. Specialty's motion for summary judgment, Doc. 60, and
Seabury's cross-motion for summary judgment, Doc. 68, as to the only remaining claim,
Count I of the complaint for breach of contract against U.S. Specialty.  *See* Compl.
¶¶ 131–140.  For the reasons set forth below, Seabury's motion is GRANTED, and U.S.
Specialty's motion is DENIED.

---

[1] As discussed below, all claims against RSUI Indemnity Co. were voluntarily dismissed on February 17,
2022.  Doc. 45.

## I.      BACKGROUND

### A.  Factual Background

U.S. Specialty issued a "claims made" insurance policy covering Seabury from October 23, 2014, to October 23, 2015.  U.S. Specialty's Response to Seabury's Rule 56.1 Statement ("Def.'s Resp. Rule 56.1 Statement"), Doc. 77 ¶ 1; *see also* Policy, Doc. 1-1.  The instant dispute arose from Seabury's claim for reimbursement of defense costs incurred in an action brought by its former chief executive officer, which U.S. Specialty denied in December 2020.  Def.'s Resp. Rule 56.1 Statement ¶¶ 178; *see also* December 21, 2020 Coverage Letter from U.S. Specialty ("Dec. 2020 Letter"), Doc. 70-96 at 1–4.  U.S. Specialty concluded that coverage was barred because Seabury's request fell within one of the policy's exclusions, namely, the Insured v. Insured Exclusion.  Dec. 2020 Letter at 1–4.

### *i.* Scope of the Policy and Relevant Terms

A "claims made" policy covers claims made against an insured during the applicable policy period.  Policy at 2.  Seabury's policy with U.S. Specialty provides the following insuring terms:

> A. The Insurer will pay to or on behalf of the **Insured Persons Loss** arising from **Claims** first made against them during the **Policy Period** or Discovery Period (if applicable) for **Wrongful Acts**.
>
> B. The Insurer will pay to or on behalf of the **Insured Organization Loss** arising from **Claims** first made against it during the **Policy Period** or Discovery Period (if applicable) for **Wrongful Acts**.

Def.'s Resp. Rule 56.1 Statement ¶ 8; Policy at 33.  As relevant to the dispute before the Court, the policy at issue here specifies that "claim" means the following:

> (1) any oral or written demand, including any demand for non-monetary relief,
>
> (2) any civil proceeding commenced by service of a complaint or similar pleading,
>
> (3) any arbitration, mediation or other similar dispute resolution proceeding,

(4) any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

(5) any criminal proceeding commenced by the return of an indictment, or

(6) any appeal from any proceeding referred to in this DEFINITION (B).

Def.'s Resp. Rule 56.1 Statement ¶ 14; Policy at 33.

Also relevant to this dispute, the policy provides specific guidance regarding the "interrelationship of claims." Def.'s Resp. Rule 56.1 Statement ¶ 23. It notes that "[a]ll **Claims** alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single **Claim** and will be considered to have been made at the time the earliest such **Claim** was made." *Id.*; Policy at 43. In other words, all claims for coverage that stem from related facts or circumstances are considered to be one single claim under the policy.[2]

The Insured v. Insured exclusion further provides that coverage is not available where a claim is brought by an insured individual or entity.[3] Def.'s Resp. Rule 56.1 Statement ¶ 27; Policy at 21. However, there are various exceptions to that exclusion. Specifically, the Insured v. Insured exclusion does *not* apply—and accordingly, U.S. Specialty *shall* provide coverage—where a claim is:

(1) brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Insured Organization** or any **Insured Person**;

(2) brought or maintained by an **Insured Person** for contribution or indemnity and directly results from another **Claim** covered under this Policy;

(3) for an actual or alleged **Employment Practices Wrongful Act**;

---

[2] In regard to costs and allocation, the policy further provides that "[i]f **Loss** covered by this Policy and loss not covered by this Policy are both incurred in connection with a single **Claim** . . . because the **Claim** includes both covered and uncovered matters . . . the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts . . . ." Policy at 43.

[3] The parties agree that the Seabury plaintiffs were insured under the policy. Def.'s Resp. Rule 56.1 Statement ¶ 36. The parties also agreed that the policy provides that an employee of an "Insured Organization" is an "Insured Person," and Ingargiola was an employee of SFX at the relevant time period. *Id.* ¶¶ 20, 37. In other words, both Seabury and Ingargiola were insured.

(4) brought and maintained by a former **Executive** who has not served as an **Executive** for at least two years prior to such **Claim** being first made; or

(5) brought and maintained by the **Insured Organization** in its capacity as debtor-in-possession pursuant to a bankruptcy proceeding;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator, creditors' committee or other similar official duly appointed with respect to the **Insured Organization**[.]

Policy at 21.[4]

The parties dispute whether the underlying claim giving rise to the instant coverage dispute falls under exception number three, as a claim "for an actual or alleged Employment Practices Wrongful Act." *Id.*; *compare* U.S. Specialty's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem. in Supp. Mot. Summ. J."), Doc. 61 at 21–29 *with* Seabury's Memorandum of Law in Support of Cross-Motion for Summary Judgment and in Opposition ("Pls.' Mem. in Supp. and Opp'n"), Doc. 69. Under the policy, an Employment Practices Wrongful Act means any actual or alleged: discrimination, retaliation, sexual harassment, workplace harassment, workplace tort, wrongful termination, or violation of the Family and Medical Leave Act. Policy at 34. As relevant to the parties' dispute, "wrongful termination" is defined as "actual or constructive termination of the employment of . . . any **Employee**, which is in violation of law, against public policy or in breach of an implied agreement to continue employment." *Id.* at 37. And "retaliation" is defined as "retaliatory treatment against an **Employee** of the **Insured Organization** on account of such **Employee's** exercise or attempted exercise of his or her rights under law." *Id.* at 35.

---

[4] These exceptions were an amendment to the policy that the parties agreed to at the time it was signed. *See* Policy at 21. It stands in the place of an analogous section at page 38 of the policy, which provides a more limited list of exceptions to the Insured v. Insured exclusion. *See id.* (agreeing that "in consideration of the premium charged," Exclusion (F) of the policy is "deleted and replaced" by the amended language); *see also* Policy at 38.

### ii. Underlying Claims Giving Rise to the Coverage Request

The dispute between the parties arose from the costs incurred by Seabury in its defense against various claims brought by a former executive, Rosario Ingargiola, and his company, FXOne LLC.  Def.'s Resp. Rule 56.1 Statement ¶ 46.  In 2013, Seabury acquired a majority stake in FXOne, which merged into a new entity called Seabury FXOne LLC ("SFX"), a plaintiff in the instant action.  *Id.* ¶¶ 46–47.  Ingargiola became the CEO of SFX pursuant to a written employment agreement between the parties.[5]  *Id.* ¶¶ 47–50.

Several years after the acquisition, in August 2015, Ingargiola began asserting various allegations against Seabury.  Specifically, in a letter dated August 12, 2015, he alleged through counsel that Seabury had engaged in "serious corporate misconduct," including the mishandling of intellectual property and confidential information, breaches of fiduciary duty, improper subordination, conflicts of interest, and interference with Ingargiola's efforts to perform as CEO of SFX.  *Id.* ¶ 51; *see also* August 12, 2015 Letter from Rothken Law Firm ("Aug. 12 Letter"), Doc. 70-2 at 1–2.  The letter alleged that "Mr. Ingargiola was often subordinated to the whims of Seabury Group surrogates and was prohibited from having access to any bank account to exercise independent discretion in the best interests of the company."  Aug. 12 Letter at 1.  Ingargiola demanded JAMS mediation pursuant to SFX's Operating Agreement, and he indicated that arbitration might also be appropriate in the future.[6]  *Id.* at 1–2.

---

[5] Ingargiola's employment agreement provided that he could be terminated "for any reason."  Ingargiola Employment Agreement ("Employment Agreement"), Doc. 62-4 at 44 ¶ 6.  The Employment Agreement further provided the conditions under which Ingargiola could be terminated, and it outlined his rights in the event that he was not terminated for cause.  *Id.*  In addition to the Employment Agreement, SFX's operating agreement, which governed its formation and affairs, also included terms pertaining to the termination of its members.  *See* SFX Operating Agreement Part I ("Operating Agreement Pt. I"), Doc. 64-3 at 42–58; SFX Operating Agreement Part II ("Operating Agreement Pt. II"), Doc. 64-4 at 2–39.  Specifically, the Operating Agreement sets forth how employee shares are to be allocated upon various forms of termination, including termination without cause.  *See* Operating Agreement Part II at 9–10.

[6] The parties agree that the August 12 letter was a mediation demand that was made during the policy period.  *See* Def.'s Resp. Rule 56.1 Statement ¶ 42.

Two days later, on August 14, 2015, Ingargiola sent another letter to Seabury, therein reiterating his allegations.  August 14, 2015 Letter from Rothken Law Firm ("Aug. 14 Letter"), Doc. 70-3.  Ingargiola alleged that he had been "retaliated against," had been "cut off from obtaining access to important materials to stop the abuse, and that there is more than enough wrongful conduct by the Seabury Parent and its surrogates to justify a constructive discharge."  *Id.* at 2.  He added that "[n]o reasonable CEO and Director should be exposed to such a stew pot of breaches of fiduciary duty coupled with a neutering of power to stop it coupled with retaliation."  *Id.*  In regard to his employment as CEO of SFX, Ingargiola alleged that Seabury had "rendered him powerless to perform his role."  *Id.*

Thereafter on August 24, 2015, Ingargiola sent an email to various Seabury executives advising that he would be resigning.  Ingargiola Resignation Email ("Resignation Email"), Doc. 70-7 at 1–10; *see also* Ingargiola Resignation Letter ("Resignation Letter"), Doc. 72-6 at 5–7 (stating his intent to resign and invoking rights concerning constructive discharge, retaliation, and owed benefits, and invoking Section 6 of the Employment Agreement).

A mediation occurred in September 2015, which resulted in an impasse.  U.S. Specialty's Initial Facts Statement ("Def.'s Facts Statement"), Doc. 60-1 ¶ 34; Compl. ¶ 38.  Around the same time, Seabury notified U.S. Specialty and RSUI about the claims being pursued by Ingargiola.  Compl. ¶¶ 34–37.  In response, U.S. Specialty indicated that, as of March 7, 2016, it "accept[ed] this matter for coverage subject to the Policy's terms, conditions and limitations, including those discussed herein."[7]  March 7, 2016

---

[7] Based on this response, Seabury asserts that "US Specialty previously admitted coverage of this Claim, only to backtrack years later."  Pls.' Mem. in Supp. and Opp'n at 5; *see also* Def.'s Mem. in Opp'n Mot. Summ. J. at 7–8.  However, in the March 2016 coverage letter, U.S. Specialty made clear that it "accept[ed] this matter" subject to the conditions noted above and repeatedly noted that the letter contained U.S. Specialty's "preliminary coverage analysis," and that a "definitive coverage analysis may not be possible until all of the issues raised in this matter have been resolved."  Mar. 2016 Coverage Letter at 1, 2.  The letter concluded by noting that U.S. Specialty "continue[d] to reserve all rights and defenses available to it

Coverage Letter from U.S. Specialty ("Mar. 2016 Coverage Letter"), Doc. 70-11 at 2. The letter stated that "the allegations set forth by Mr. Ingargiola constitute Wrongful Termination, which is a Wrongful Act under the Policy." *Id.*

Several years later, in August 2018, Ingargiola and FXOne commenced an arbitration proceeding against Seabury.[8] *See* Arbitration Demand, Doc. 70-12. The demand sought various claims for relief, including two counts of breach of the Operating Agreement at Sections 8.2, 8.3, and 2.7, *id.* ¶¶ 91–101, one count of breach of fiduciary duty, *id.* ¶¶ 102–105, one count of shareholder oppression, *id.* ¶¶ 106–111, and one count of breach of the Employment Agreement as a result of his constructive termination, *id.* ¶¶ 112–114. The demand sought an award of damages totaling $32 million. Compl. ¶ 46.

Seabury responded to the arbitration demand in late September 2018, and it also asserted counterclaims for fraud, breach of contract, and breach of fiduciary duty. *See* Seabury's Response in Opposition to Arbitration Demand ("Pls.' Resp. in Opp'n to Arbitration"), Doc. 70-13–70-17 at Doc. 70-17 ¶¶ 172–190.

During this period, U.S. Specialty and Seabury corresponded on several occasions regarding Seabury's claim for the costs incurred in its defense of Ingargiola's allegations. *See, e.g.*, November 6, 2018 Coverage Letter from U.S. Specialty ("Nov. 2018 Coverage Letter"), Doc. 70-18 at 1–5. As of November 6, 2018, U.S. Specialty determined that coverage was *not* available because of the Insured v. Insured exclusion. *Id.* at 3. The letter noted that Ingargiola was an "Insured Person" under the agreement, and that the exclusion thus barred coverage because the claim was not "for" an "Employment

---

under the policy and otherwise, including the right to raise additional issues that may affect coverage." *Id.* at 4.

[8] As U.S. Specialty notes in its opening brief, "[a]lthough the Arbitration was filed after the Policy Period, [the parties] agree that the Arbitration is deemed part of a single Claim first made during the Policy Period, at the time of the Mediation Demand, pursuant to Policy Condition (C)." Def.'s Mem. in Supp. Mot. Summ. J. at 15; *see also* Aug. 12 Letter.

Practices Wrongful Act," an exception to the Insured v. Insured exclusion.[9]  *Id.*  U.S.
Specialty reiterated its position one year later in a letter dated November 18, 2019.  *See*
November 18, 2019 Coverage Letter from U.S. Specialty ("Nov. 2019 Coverage Letter"),
Doc. 70-28 at 1–5.[10]

These coverage conversations between the parties were ongoing as the arbitration
was proceeding.  And in August 2020, the arbitration tribunal issued a decision.  *See*
JAMS Arbitration Decision ("Arbitration Decision"), Docs. 70-81–70-87.  As relevant
here, the decision provided the following summary:

> 2.  This arbitration involves . . . Seabury Financial Solutions LLC,[11]
> formed for the purpose of obtaining, developing, and exploiting for profit
> certain technology and expertise useful in the trading of foreign exchange
> ("FX").  The Claimants and one of FXOne's subsidiaries . . . supplied the

---

[9] In relevant part, the letter stated the following:

> As the former CEO and former board member of Seabury FXOne, Ingargiola constitutes
> an Insured Person, such that [the Insured v. Insured exclusion] bars coverage to the extent
> the Claim is not for an Employment Practices Wrongful Act.  In this regard, we note that
> Definition (F) provides that Employment Practices Wrongful Acts include Wrongful
> Termination, defined in relevant part as actual or constructive termination of the
> employment of any Employee, which is in violation of law, against public policy or in
> breach of an implied agreement to continue employment.

> While U.S. Specialty initially determined based on the information available at the time
> that the Demand Letter involved Wrongful Termination as that term is defined in the
> Policy, it is now clear from the more specific articulation of the constructive termination
> count in the Arbitration Demand that these allegations only seek relief for the breach by
> the respondents of an *express* written Employment Agreement entered into by the parties.
> Because the Policy's definition of Wrongful Termination contemplates in relevant part
> that coverage is triggered in connection with an actual or constructive termination which
> is in breach of an *implied* agreement to continue employment, the Arbitration demand
> does [sic] involve Wrongful Termination and does not constitute a Claim for an
> Employment Practices Wrongful Act.  Accordingly, the Employment Practices Wrongful
> Act exception contained [the Insured v. Insured exclusion] does not apply and the
> exclusion operates to bar coverage for the Arbitration Demand in its entirety.

Nov. 2018 Coverage Letter at 3.

[10] In its November 2019 Coverage Letter, U.S. Specialty rejected Seabury's position that it had "improperly
denied coverage after initially indicating that it would proceed under a reservation of rights."  Nov. 2019
Coverage Letter at 5.  It further noted that its March 2016 Coverage Letter "expressly stated that it
constituted a *preliminary* coverage analysis based on the allegations contained in a Demand Letter that
preceded the filing of the more formal Arbitration Demand, which constitutes the operative Claim in this
matter."  *Id.* (emphasis in original).

[11] Plaintiff Seabury FXOne LLC was formerly known as Seabury Financial Solutions LLC.  *See* Def.'s
Mem. in Supp. Mot. Summ. J. at 10 (citation omitted).

expertise and the technology.  Two of the Seabury family companies . . . supplied the capital.  Together, Mr. Ingargiola, FXOne and these entities formed Seabury Financial Solutions LLC ("SFX").

[ . . . ]

8.  SFX began to operate, but, as explained in further detail below, the parties' interests diverged when Mr. Ingargiola's projections for the growth and profitability of the venture were never realized.  This, coupled with SFX's continuing need for further funding much in excess of that called for under the agreements, caused the majority owner to propose building needed FX technology – then being developed for SFX – in a new company, Seabury Financial Technologies LLC, that would bear the cost.  That company was substantially owned by the corporate Respondents or their affiliates.  When Mr. Ingargiola objected to that idea, Mr. Luth[12] then suggested a loan to be secured by all of SFX's assets.  Mr. Ingargiola vetoed that suggestion as he had a right to do under the terms of the [Operating Agreement].

9.  Ultimately, Mr. Ingargiola claims that the Respondents and their affiliates, as part of their conspiracy to steal FXOne's technology, threatened a withdrawal of funding and constructively terminated him from his employment as CEO, leaving them and their affiliates in complete control of FXOne's valuable assets.  They then usurped corporate opportunities belonging to SFX, reorganized the company, and began to exploit the FX business to the detriment of both SFX and FXOne as the minority member.  Mr. Ingargiola also claims that FXOne's equity interest was improperly diluted by reason of Seabury's infusion of capital coupled with low company valuations after Mr. Ingargiola's departure.

10.  Claimants contend that the above conduct constitutes breaches of contract, breaches of the fiduciary duties that the managers owed to the Claimants and to SFX, theft of corporate opportunities (arising out of the Respondents' investments in companies named Spotex LLX and Noble Bank), and the Respondents' oppression of the minority unit holder.  As a result, the Claimants seek the equitable remedy of a forced buyout of FXOne's equity position at fair market value as of the date of Mr. Ingargiola's departure.

11.  The Respondents deny this version of the story and claim that Mr. Ingargiola was terminated for cause when his fraudulent and reckless predictions of eventual profitability based on viable technology were never realized.  The Respondents do not deny that, at one point, Seabury considered building technology that SFX needed (but could ill-afford) in Seabury Financial Technologies (a company in which neither SFX nor FXOne had an interest), but that, when Mr. Ingargiola objected to the proposal, the idea "died on the vine."  They further contend that—after Mr. Ingargiola had left the company—they did not usurp corporate opportunities through their investments . . . .

---

[12] During the relevant time period, John E. Luth was a director of SFX and a member of its Board of Managers.  Def.'s Resp. Rule 56.1 Statement ¶ 6; Arbitration Demand ¶ 4.

Arbitration Decision, Doc. 70-81 ¶¶ 2, 9–11.

      After considering the parties' claims and counterclaims, the tribunal made the following final decisions:  (1) Ingargiola and FXOne's claim for an award of the fair market value of SFX as of the date of his departure was dismissed and denied; (2) in regard to Ingargiola's termination claim, the tribunal found that Ingargiola was terminated without cause pursuant to Section 8.3 of the parties' Operating Agreement,[13] and SFX was ordered to recognize his option to retain his implied equity interest in the company; (3) Seabury's counterclaims were all dismissed and denied; and (4) SFX was ordered to pay the expenses of JAMS' administrative fees and the fees of the arbitrator, and each side was to bear its own legal fees and costs.  Arbitration Decision, Doc. 70-86 at 12.

      Several months later, on November 17, 2020, Seabury wrote to U.S. Specialty and RSUI regarding its claim for coverage.  November 17, 2020 Letter from Zukerman Gore ("Nov. 2020 Letter"), Docs. 70-88–70-95.  Seabury stated that there was "no doubt that the claim is covered and that US Specialty and RSUI have an obligation to reimburse Seabury's defense costs, which now total $4,458,438.10."  Nov. 2020 Letter, Doc. 70-88 at 1.  The letter discussed the arbitration proceedings and noted the following:

---

[13] In regard to Ingargiola's termination, the arbitrator specifically concluded the following:

> After consideration of all the facts, the arbitrator concludes that Mr. Ingargiola was constructively terminated from his employment at SFX.  Mr. Ingargiola's powers and role as CEO were undermined for all the reasons set forth at pages 41-42 of Claimants' Post-Hearing Brief.  Mr. Luth [and others] suggested . . . that the REEF project be undertaken and financed in another Seabury entity without inviting Mr. Ingargiola to participate in these discussions[.]  This was a serious breach of protocol.  Mr. Ingargiola was the CEO and, as such, he was entitled to participate, if not to direct, all of these discussions.  If at that point the [Board of Managers] had lost confidence in his ability as a manager, the remedy was to call a [] meeting and fire or demote him.  The remedy was not to go behind his back and start discussions that could result in the licensing to a separate entity of a significant part of the technology to which SFX was presumptively entitled.  That effort never caused damage to the Company as Mr. Ingargiola was presented with the proposal before it was implemented, and his veto was honored.  That does not, however, excuse the undermining of his executive authority which gave him ample reason to resign.

Arbitration Decision, Doc. 70-86 ¶ 185.  The arbitrator further concluded that Ingargiola was justified in resigning under the circumstances, though it noted various ways in which Ingargiola acted problematically. *Id.* ¶ 186.

> As you know, the purported grounds for refusing to reimburse defense costs has been US Specialty's (incorrect) assertion that the insured versus insured exclusion bars coverage. But, as we have previously made clear, and as is now confirmed by the findings of the arbitrator, there is no basis for US Specialty or RSUI to deny that this Claim involves an Employment Practices Wrongful Act within the meaning of the Policy. This places the Claim within the exception to that exclusion. Therefore, US Specialty must reimburse Seabury for its Defense Costs. And, moreover, because the Excess Policy follows the terms contained in the Primary Policy issued by US Specialty, RSUI must reimburse Seabury for all Defense Costs that exceed the $2 million limit of liability on the Primary Policy.

*Id.* at 3.

In response to the November 2020 Letter, U.S. Specialty re-asserted its position that coverage was unavailable due to the Insured v. Insured exclusion. Dec. 2020 Letter at 1. U.S. Specialty noted that the operative claim "is the Arbitration proceeding as a whole, not its component parts or individual allegations. Accordingly the Insured v. Insured Exclusion bars coverage for the entirety of the Claim (*i.e.* the Arbitration) unless it can be shown that the Arbitration constitutes a Claim for an Employment Practices Wrongful Act." *Id.* at 2. The letter further noted that the Arbitration stemmed from a broader business dispute regarding the parties' interests in a joint venture. *See id.* at 2–4.

### B. Procedural History

The Seabury Plaintiffs filed the complaint on January 29, 2021. *See* Compl. U.S. Specialty and RSUI answered and asserted counterclaims on March 24, 2021. Doc. 19; Doc. 21. Plaintiffs filed an answer to RSUI's counterclaim on April 14, 2021. Doc. 25. The Court entered a civil case discovery plan and scheduling order on August 18, 2021, and the parties proceeded to discovery. Doc. 30.

Nearly six months later, on February 16, 2022, plaintiffs filed a notice of voluntary dismissal with prejudice as to defendant RSUI. Doc. 45. All claims and counterclaims involving RSUI were dismissed with prejudice and without costs or disbursements. *Id.*

On April 7, 2022, the Court held a case management conference, during which it heard the parties' requests for leave to file the instant cross-motions for summary

judgment.  Min. Entry dated Apr. 7, 2022.  The Court granted the parties' requests and set a briefing schedule.  After various extensions, the motions were fully submitted on August 5, 2022.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its

favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

## III.   DISCUSSION

The parties cross-move for summary judgment as to the single remaining claim, Count I of the complaint alleging breach of contract against U.S. Specialty. Compl. ¶¶ 131–140; Fed. R. Civ. P. 56(a). For the reasons set forth below, Seabury's motion is granted, and U.S. Specialty's motion is denied.

### A.   Applicable Law

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citations omitted). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (citation omitted).

An insurer seeking to invoke an exclusion provision in order to be released from its coverage obligations has the burden to demonstrate that the "allegations of the

complaint place that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *Bodewes v. Ulico Cas. Co.*, 336 F. Supp. 2d 263, 272 (W.D.N.Y. 2004) (citations omitted); *see also Nat'l Football League v. Vigilant Ins. Co.*, 824 N.Y.S.2d 72, 75 (N.Y. App. Div. 1st Dep't 2006) ("To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.") (citations omitted); *see also Women's Integrated Network, Inc. v. U.S. Specialty Ins. Co.*, No. 08 Civ. 10518 (SCR), 2012 WL 13070116, at *4 (S.D.N.Y. Oct. 26, 2012).  Accordingly, policy exclusions are given "strict and narrow construction, with any ambiguity resolved against the insurer." *Vigilant Ins. Co.*, 824 N.Y.S.2d at 75.

In assessing insurance coverage disputes, exclusions are given their plain meaning.  *See, e.g., Levy v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 889 F.2d 433, 434 (2d Cir. 1989) (applying New York law to "Insured v. Insured" exclusion and noting that "[w]here terms used in an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning").  When assessing the meaning of contractual language, "it is important for the court to read the integrated agreement as a whole," *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citation and internal quotation marks omitted), and, accordingly, "the contract should be construed so as to give full meaning and effect to all of its provisions."  *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and alteration omitted).  "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement.'" *Lockheed Martin*, 639 F.3d at 69 (quoting *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998) (alteration omitted)).

"[I]n reimbursement cases, so long as the policy does not specify otherwise, the court may consider the eventual resolution of the claims to determine if they were actually (not just arguably) covered."  *Petroterminal de Panama, S.A. v. Houston Cas. Co.*, 114 F. Supp. 3d 152, 158 (S.D.N.Y. 2015).

## B.  The Parties' Contentions

The Court briefly summarizes the parties' competing arguments.  According to Seabury, the operative "claim" to be analyzed includes "the mediation demand, the arbitration demand, and Ingargiola's other oral and written demands."  Pls.' Mem. in Supp. and Opp'n at 22–23.  Taking those elements together, Seabury argues that Ingargiola asserted three types of Employment Practices Wrongful Acts ("EPWAs") in his demands, including wrongful termination, workplace tort, and retaliation.  *Id.* at 9–17.  Therefore, "the gravamen of the case was Ingargiola's loss of power as an employee, not his status as a shareholder," *id.* at 22, and the claim thus falls under the EPWA exception to the Insured v. Insured exclusion, *id.* at 22–23.

According to U.S. Specialty, the "claim" at issue here stems from the defense costs incurred during the *arbitration* proceeding, which falls under the Insured v. Insured exclusion.  Def.'s Mem. in Supp. Mot. Summ. J. at 16–20.  Because the arbitration dispute arose from a shareholder dispute over a joint venture, rather than an EPWA, U.S. Specialty contends, the exception to the Insured v. Insured exclusion does not apply, and, therefore, it is not obligated to provide coverage pursuant to Seabury's claim.  *Id.* at 20–29.  In other words, according to U.S. Specialty, this was not an employment action at all.

With these positions in mind, the key question before the Court is whether genuine disputes of material fact remain as to whether Seabury's claim was made pursuant to "loss on account of" a claim "for an actual or alleged Employment Practices Wrongful Act."  *See* Policy at 3, 21, 37–38.  Because the Court concludes that no such issues remain and Seabury is entitled to judgment as a matter of law, Seabury's motion is granted, and U.S. Specialty's motion is denied.  *Anderson*, 477 U.S. at 248 (noting that

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

As a preliminary matter, the Court agrees with Seabury that its claim for coverage encompasses elements beyond the scope of the arbitration proceedings, including the mediation demand made in 2015.  Pls.' Mem. in Supp. and Opp'n at 22.  As noted above, the policy provides that that all claims "alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events . . . will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made."  Policy at 43.  In other words, where an insured party incurs defense costs from multiple demands, proceedings, or arbitrations stemming from the same facts, the policy treats the costs incurred as one "claim" for the purposes of coverage.  *Id.* at 33, 43.

Here, the record makes clear that the factual basis for Ingargiola's mediation demand and subsequent arbitration proceedings was the same:  both stemmed from purported misconduct by Seabury which resulted in various alleged breaches and the improper termination of Ingargiola in 2015.  *See* Aug. 12 Letter at 1–2; Aug. 14 Letter at 1–5; Arbitration Demand ¶¶ 91–114; Arbitration Decision, Doc. 70-86 at 12.  Indeed, in substance, the allegations made in the August 2015 demand letters and before the arbitration proceeding all involved Ingargiola's contentions that Seabury wrongfully stripped him of his control and ability to perform as the CEO of SFX.  In fact, the arbitration went forward *after* the parties reached an impasse during their attempts to resolve the claims through mediation.  Def.'s Facts Statement at 34; Compl. ¶ 38.

Critically, as U.S. Specialty noted in its opening brief, "[a]lthough the Arbitration was filed after the Policy Period, Seabury and U.S. Specialty agree that the Arbitration *is deemed part of a single Claim* first made during the Policy period, at the time of the Mediation Demand, pursuant to Policy Condition (C)."  Def.'s Mem. in Supp. Mot. Summ. J. at 15 (emphasis added).  This agreement between the parties is key.  Indeed, the

allegations laid out in Ingargiola's August 2015 letters—including his contentions that Seabury had "rendered him powerless to perform his role as CEO," so as to "justify a constructive discharge," and had otherwise retaliated against him—are thus before the Court as the same "Claim" under the policy. Aug. 14 Letter at 2. U.S. Specialty nevertheless claims that "pre-Arbitration allegations for which the Arbitration Demand did not seek relief are irrelevant to coverage for the Arbitration." Def.'s Mem. in Opp'n Mot. Summ. J. at 6. But as noted throughout this litigation, for purposes of coverage under the policy, those pre-Arbitration allegations are part of the same "claim" as those set out in the Arbitration itself. Def.'s Mem. in Supp. Mot. Summ. J. at 15; *see also* Answer, Doc. 19 ¶ 79. That concession is incorporated throughout U.S. Specialty's briefing, specifically insofar as U.S. Specialty does not argue that the claim is beyond the scope of the policy's coverage period. *See id.*; *see also* Pls.' Mem. in Supp. and Opp'n at 23–24; *see also* Policy at 43 (noting that all claims attributable to the same facts or circumstances "will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made").

Notwithstanding that concession, U.S. Specialty reaches to argue that "even if the Mediation Demand and the Arbitration were considered together as part of the same 'Claim' pursuant to Condition (C), the vague and less-developed allegations in the Mediation Demand were replaced by the Arbitration Demand when filed." Def.'s Mem. in Supp. Mot. Summ. J. at 20 (citing *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 141 (2d Cir. 2014); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). However, that reasoning fails in various regards.

First, the Court cannot conclude that the allegations in the mediation demand "were replaced" by the arbitration demand when filed. *Id.* As already discussed, the policy at issue in this case calls for all claims stemming from the same set of facts to be considered as one claim for the purposes of coverage. Additionally, the cases that U.S. Specialty cites for the proposition that the arbitration demand replaced the prior

mediation demand are inapposite; in those cases, the Second Circuit reiterated the well-established tenet that an amended complaint supersedes an original complaint filed in a civil proceeding. *Hartford Cas. Ins. Co.*, 754 F.3d at 141; *Shields*, 25 F.3d at 1128. Here, on the other hand, the Court is not considering a claim for relief filed in court, but a series of demands that must be assessed together per the terms of the policy. *See* Policy at 33, 43. Furthermore, U.S. Specialty diminishes the nature and content of the allegations set forth in the arbitration demand. Indeed, most of the contentions set forth in the August 2015 demand letters were also separately brought in the 2018 arbitration. *See* Arbitration Demand ¶¶ 70–73, 91–101, 112–114 (claiming that Seabury limited Ingargiola's ability to investigate misconduct, refused to adequately fund SFX, made Ingargiola's working conditions "so intolerable that any reasonable person in his position would be compelled to resign," and alleging that respondents breached Sections 8.2, 8.3, and 2.7 of the Operating Agreement and Section 6 of the Employment Agreement).

To be sure, the facts and circumstances giving rise to Seabury's claim for coverage include allegations about the oppression of minority unit holders. Arbitration Decision ¶ 10; Def.'s Mem. in Supp. Mot. Summ. J. at 23–27. However, the mere fact that the circumstances giving rise to Seabury's claim include various types of accusations *in addition to* allegations concerning Ingargiola's wrongful termination[14] and other

---

[14] The parties dispute whether Ingargiola's constructive termination allegations amount to "wrongful termination" under the policy, given that that term is defined as "actual or constructive termination of . . . any Employee, which is in violation of law, against public policy or in breach of an *implied agreement* to continue employment." Policy at 37 (emphasis added); *compare* Def.'s Mem. in Supp. Mot. Summ. J. at 7 *with* Pls.' Mem. in Supp. and Opp'n at 7 (noting that Ingargiola's written Employment Agreement "contained no promise to continue his employment (indeed and to the contrary, his Employment Agreement provided that SFX could terminate him without cause)"). According to U.S. Specialty, Ingargiola's employment involved an express employment contract, and therefore does not fall under the policy's definition because there was no *implied* agreement regarding the continuation of his employment. Def.'s Mem. in Supp. Mot. Summ. J. at 7. Seabury, on the other hand, argues that there was also no express agreement regarding the continuation of his employment, therefore, Ingargiola's termination does fall under the policy's definition of "wrongful termination." Pls.' Mem. in Supp. and Opp'n at 7. Seabury also notes that this point is not dispositive, in any event, because the policy "uses the "disjunctive word 'or' to make clear that a Wrongful Termination exists upon a showing of any *one* of three options," including constructive termination in violation of law, against public policy, or in breach of an implied agreement to

wrongful employment actions does not render the claim beyond the scope of the EPWA exception to the Insured v. Insured exclusion.  Indeed, an insurance claim emerging from a claim for improper termination *and* shareholder oppression may indeed be "for" an "actual or alleged" EPWA, including retaliation, workplace tort, or wrongful termination, depending on evidence pertaining to the facts that gave rise to the underlying action and the nature of the allegations themselves.  *See* Policy at 21, 34.

In this case, that evidence includes, among other things:  allegations of interference with Ingargiola's efforts to perform as CEO of SFX, Aug. 12 Letter at 1; allegations that Seabury had "rendered him powerless to perform his role as CEO," and that its wrongful conduct amounted to a "constructive discharge," Aug. 14 Letter at 2; allegations that Seabury wrongfully retaliated against him for exercising his rights as CEO and as an employee, Resignation Letter at 5–7; and allegations that Seabury had breached the Employment Agreement via constructive termination, Arbitration Demand ¶¶ 112–114.  As Seabury notes, "*all* of Ingargiola's damages were alleged to have arisen on the day of his constructive termination."  Pls.' Mem. in Supp. and Opp'n at 21; *see also* Arbitration Demand; Aug. 12 Letter; Aug. 14 Letter.  And they all stemmed from Seabury's alleged efforts to strip Ingargiola of his power and control as the CEO of SFX in a way that was "so intolerable that any reasonable person in his position would be compelled to resign."  Arbitration Demand ¶ 113; *see also Fischer v. KPMG Peat Marwick*, 607 N.Y.S.2d 309, 311 (1994) (noting that constructive termination exists where an employer has made working conditions so difficult that a reasonable person would feel forced to resign).

---

continue employment, all of which are present in this case.  *Id.* at 10–13 (emphasis in original).  The Court notes that Ingargiola's Employment Agreement indicates that he could be terminated at any time "for any reason."  Ingargiola Employment Agreement ¶ 6.  However, various documents including the arbitration demand make clear that Ingargiola alleged that he was constructively terminated against the law and/or public policy, specifically insofar as he invoked "working conditions so intolerable that any reasonable person in his position would be compelled to resign."  Arbitration Demand ¶ 113.  Accordingly, U.S. Specialty's argument that Ingargiola's claim does not fall under the policy's definition of actual or alleged wrongful termination is unavailing.  *See* Policy at 37.

Moreover, the arbitrator specifically found that Ingargiola had been "constructively terminated," noting that "Mr. Ingargiola's powers and role as CEO were undermined" for a variety of reasons.  Arbitration Decision, Doc. 70-86 ¶ 185 ("This was a serious breach of protocol. . . .  If at that point the [Board of Managers] had lost confidence in his ability as a manager, the remedy was to call a [Board of Managers] meeting and fire or demote him.  The remedy was not to go behind his back and start discussions that could result in the licensing to a separate entity of a significant part of the technology to which SFX was presumably entitled.").  The arbitrator made clear that Seabury had improperly undermined Ingargiola's executive authority.  *Id.*

Taking all of these facts together, and considering that insurers may not be released from coverage obligations unless exclusions clearly and unmistakably apply to a given case, Seabury's motion is granted, and U.S. Specialty's motion is denied.  *Bodewes*, 336 F. Supp. at 272; *Vigilant Ins. Co.*, 824 N.Y.S.2d at 75.  The Court concludes that the "claim" giving rise to Seabury's coverage request was indeed "for" alleged EPWAs, namely, the constructive termination of Ingargiola in violation of the law or against public policy and related retaliation.  *See* Policy at 35, 37.

Importantly, in a separate case involving U.S. Specialty, a court in this District previously determined that the exact same EPWA exception at issue here was triggered by an allegation that an employee was "fired in retaliation," which "could arguably amount to a wrongful termination claim even if the [] Complaint does not label any one cause of action that way."  *Women's Integrated Network, Inc.*, 2012 WL 13070116, at *6. In other words, coverage was triggered by facts that fell "within the scope of coverage," even where the claim included allegations of wrongdoing in addition to the alleged EPWAs.[15]  *See id.*  Here, the underlying claim *did* involve allegations of improper,

_____

[15] The parties heavily dispute the main holdings and takeaways from the *Women's Integrated Network, Inc.* ("*WIN*") case.  According to U.S. Specialty, *WIN* is distinguishable from this case for several reasons:  (1) the underlying claimant alleged the absence of an employment agreement; (2) the language at issue

constructive termination from the very start.  *See* Aug. 12 Letter; Aug. 14 Letter.  And, as described above, those allegations persisted throughout the arbitration.

U.S. Specialty asks the Court to disregard the *WIN* decision in light of various other cases involving similar policy provisions, including *U.S. TelePacific Corp. v. U.S. Specialty Ins. Co.*, No. 18 Civ. 5083 (DMG), 2019 WL 2590171 (C.D. Cal. June 18, 2019) and *Certain Underwriters at Lloyd's, London v. Convergys Corp.*, No. 12 Civ. 8968 (CRK), 2014 WL 3765550 (S.D.N.Y. Mar. 25, 2014).  However, those cases are distinguishable and inapplicable here.

*U.S. Telepacific Corp.* also involved a claims made policy issued by U.S. Specialty.  2019 WL 2590171, at *1.  When the insured sought coverage for a class action suit alleging various wage-and-hour claims, U.S. Specialty concluded that the claim was outside the scope of the policy's coverage, *id.*, and it relied on the very Insured v. Insured exclusion at issue in this case, *id.* at *9.  While the insured reasoned that the wage-and-hour allegations "could provide a basis for employment-related misrepresentation and negligence claims," the court concluded that that contention "stretch[ed] the Policy and the underlying claims too far," and it specifically called into question the insured's argument that "the Policy not only covers claims that [the plaintiffs in the underlying

─────────────────────

amounts to dicta; and (3) the *WIN* court "failed to consider or address the plain and narrow meaning of the exception's language, nor did it consider or address the policy language with the 'potential for coverage' standard."  U.S. Specialty's Combined Memorandum of Law in Opposition and in Support ("Def.'s Mem. in Opp'n Mot. Summ. J."), Doc. 78 at 14–15.  Seabury emphasizes that *WIN* "interpreted the *exact same policy language* against US Specialty, and rejected the argument that US Specialty tries to make here again," and it also notes that current caselaw shows that courts apply duty-to-defend standards when assessing coverage in the context of policies that call for the reimbursement of defense costs.  Seabury's Combined Memorandum of Law in Support and in Opposition ("Pls.' Mem. in Supp. Mot. Summ. J."), Doc. 82 at 5, 11–12.  While *WIN* is not dispositive or controlling here, the Court notes that U.S. Specialty's contention about the absence of an employment agreement in the that case amounts to a distinction without a difference.  Indeed, U.S. Specialty relies on only one of three definitions of "wrongful termination" to draw the alleged distinction.  Def.'s Mem. in Opp'n Mot. Summ. J.  at 14; *but see* Policy at 37.  Additionally, as to U.S. Specialty's third point, the *WIN* decision concludes that "the effective difference" between allegations concerning a duty to defend and the payment of defense costs is "who chooses and pays the defense attorney, not whether a defense obligation lies with the insurer."  *Women's Integrated Network, Inc.*, 2012 WL 13070116, at *6 (quoting *Fed. Ins. Co. v. Kozlowski*, 792 N.Y.S. 2d 397, 402 n.10 (N.Y. App. Div. 1st Dep't 2005) (internal quotations omitted)).

action] actually made, but also any claims that *could* arise 'by reason of, on account of, or because of' the Complaint's allegations." *Id.* (emphasis in original).  Similarly, *Convergys Corp.* involved a claims made policy invoked by a corporation after it had been sued in a class action for alleged violations of the Telephone Consumer Protection Act.  2014 WL 3765550, at *1.  The insurer denied coverage under a policy exclusion for claims stemming from the violation of consumer protection laws, notwithstanding an exception allowing coverage for claims failures to comply with a specific subset of privacy policies.  *Id.* at *3–4.  In concluding that the exception did not apply, the *Convergys Corp.* court held that the insured's interpretation "asks too much of the word 'for,'" given that the underlying suit did not involve allegations of an actual violation of the privacy policy set out in the exception to the exclusion.  *Id.* at 5.

Relying on the reasoning of those cases, U.S. Specialty argues here that Seabury asks too much of the word "for" within the EPWA exception to the Insured v. Insured exclusion.  Def.'s Mem. in Supp. Mot. Summ. J. at 21.  However, as described above, Seabury's coverage request under the EPWA exception does not involve claims that "*could* arise" or might arise from Ingargiola and FXOne's allegations; rather, it arises from the underlying allegations themselves, which were laid out in the mediation demand, arbitration demand, and corresponding documents.  *U.S. Telepacific Corp.*, 2019 WL 2590171, at *9 (emphasis in original).  Unlike the underlying claims at issue in *U.S. Telepacific Corp.* and *Convergys Corp.*, the allegations here directly invoked various alleged EPWAs, including wrongful termination via constructive discharge and retaliation.  Accordingly, the instant case does indeed trigger the application of the exception to the Insured v. Insured exclusion.

For all the reasons stated herein, Seabury's motion for summary judgment as to the remaining breach claim is granted, and U.S. Specialty's cross-motion is denied.

Notwithstanding this conclusion, the Court agrees with U.S. Specialty's argument that Seabury is not entitled to summary judgment on the issue of allocation of defense

costs at this juncture.  Def.'s Mem. in Opp'n Mot. Summ. J. at 25.  The policy provides that the parties are to use their "best efforts to determine a fair and proper allocation" of defense costs where a claim may include some uncovered matters.  Policy at 43.

Here, the parties have not done so, in part due to U.S. Specialty's contention that the Insured v. Insured Exclusion bars coverage of all costs in full.  Def.'s Mem. in Opp'n Mot. Summ. J. at 25.  While it may be true that it is not "factually possible to allocate," in this case due to the "interrelated nature of the allegations," as Seabury contends, Pls.' Mem. in Supp. and Opp'n at 33, the record does not reflect that the parties have even attempted to do so, Policy at 43; Def.'s Mem. in Opp'n Mot. Summ. J. at 25 ("Seabury cannot show that any allocation would be impossible without knowing or asserting between what matters an allocation would be needed—nor can U.S. Specialty respond to that argument when it maintains that *no* coverage exists.").  Critically, as discussed above, the allegations giving rise to this claim involved various types of accusations *in addition to* EPWAs.  Accordingly, the Court declines to determine, as a matter of law, that defense costs ought not be allocated in any manner at this stage.

## IV.    CONCLUSION

For the foregoing reasons, Seabury's cross-motion for summary judgment, Doc. 68, is GRANTED, and U.S. Specialty's motion for summary judgment, Doc. 60, is DENIED.

Notwithstanding the Court's resolution of the remaining coverage dispute, the Court notes that the allocation of defense costs remains at issue here.  The parties are thus directed to appear for a telephonic status conference at 11 AM on March 15, 2023.  The parties are directed to dial (877) 411-9748 and enter access code 3029857#.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 60, 68.

It is SO ORDERED.

Dated:     February 24, 2023
           New York, New York

_____
           EDGARDO RAMOS, U.S.D.J.